UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| ARCHER-DANIELS-MIDLAND COMPANY AND ADM LATIN AMERICA, INC., <br><br>  Petitioners, <br><br> v. <br><br> REGIS PAILLARDON, <br><br> Respondent. | ) ) ) ) ) ) ) Case No.: 2:12-cv-02227-MPM-DGB ) ) ) ) ) |

## ARCHER-DANIELS-MIDLAND COMPANY AND ADM LATIN AMERICA, INC.'S REPLY MEMORANDUM IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD

Petitioners Archer-Daniels-Midland Company ("ADM") and ADM Latin America, Inc. ("ADM Latin") respectfully submit this reply memorandum in support of their Petition to Vacate Arbitration Award in favor of Respondent Regis Paillardon.

### INTRODUCTION

The Arbitrator found that ADM breached the Joint Venture Agreement ("JVA") "by unilaterally terminating it and stopping the performance of the Business" and awarded Mr. Paillardon $31 million in "lost profits" damages, representing the amount of profit Mr. Paillardon claimed he could have expected to receive had ADM not terminated the JVA. In construing the contractual relationship in order to arrive at his award, however, the Arbitrator also found that ADM maintained "unfettered discretion" under the JVA to determine whether to make sales with ADMV's assistance. Because of this "unfettered discretion," ADM was within its rights under the JVA to stop making sales to Venezuelan customers through ADMV.

Even though he expressly recognized ADM's "unfettered discretion" to stop all sales, the Arbitrator nonetheless contradicted these contractual terms by awarding lost profits damages to

Mr. Paillardon that presume the continuation of sales ADM had properly stopped making. In response, Mr. Paillardon contends that ADM's argument that the award is internally inconsistent is without merit because the Arbitrator did not in fact hold that ADM's stopping sales into Venezuela with ADMV's assistance would amount to a breach of the JVA, but instead found only that ADM breached the JVA by not following the requirements of Section 7.2 of the JVA. Mr. Paillardon's desire to interpret the award in such a manner is understandable: any holding that ADM breached the JVA by ceasing to make sales with the assistance of ADMV would undeniably contradict the express terms of the JVA and the Arbitrator's finding that ADM enjoyed "unfettered discretion" to decide to not make any sales through ADMV.

ADM is happy to assume Mr. Paillardon's contention that the Arbitrator found that ADM breached the JVA not by stopping sales but only by unilaterally terminating it. The central point made in ADM's petition to vacate remains true: an award of lost profit damages of $31 million based on projected future sales cannot stand when ADM had the contractual right (which it exercised) in ceasing any and all sales through ADMV.[1] As a result, ADM's unilateral termination of the JVA *did not cause Mr. Paillardon to lose any profit*. As the record evidence establishes, ADM decided in June 2009 that it could not trust Mr. Paillardon and would not do any more business with him. Thus, regardless of whether the JVA was terminated, ADM remained free to and would have done exactly what it did—stop making sales through ADMV—and thus any damages award predicated on future sales which would not have occurred is inconsistent with the JVA and the undisputed factual record.

Review of an arbitration award is concededly limited. But it is well accepted that an award must "draw[] its essence" from the parties' rights and obligations under the contract, and

---

[1] For the purposes of this petition, ADM does challenge the Arbitrator's conclusion that it technically breached the JVA by unilaterally terminating it.

an arbitrator is decidedly not free to "dispense his own brand of industrial justice." *United Food & Commercial Workers, Local 1546 v. Ill.-Am. Water Co.*, 569 F.3d 750, 754-55 (7th Cir. 2009) (quotation marks omitted). When an award "*cannot logically follow* from the agreement," a court should accordingly refuse to enforce it. *Arch. of Ill. v. Dist. 12, United Mine Workers of Am.*, 85 F.3d 1289, 1294 (7th Cir. 1996) (emphasis added). Here, the award of $31 million does not logically follow from the unilateral termination, and must therefore be vacated.[2]

ARGUMENT

## I. THE $31 MILLION AWARD UNDER THE JOINT VENTURE AGREEMENT MUST BE VACATED

The Arbitrator decided "that ADM breached the JVA by unilaterally terminating it and stopping the performance of the Business" and awarded Mr. Paillardon $31 million in lost profits damages. Pet. Ex. 2 (Award at 47, 51, 55). As explained in ADM's opening memorandum, this award must be vacated for the following three reasons.

### A. The Arbitrator Exceeded His Powers By Failing To Interpret The Contract

The Arbitrator held that ADM breached the JVA for two reasons: (1) by unilaterally terminating it, and (2) by refusing to continue to do business with the assistance of ADMV. Pet. Ex. 2 (Award at 47). But in holding ADM liable in the amount of $31 million for these alleged breaches, the Arbitrator's award did not "draw its essence" from the JVA. *United Food &*

---

[2] Mr. Paillardon notes that he filed a petition to confirm the award in the Southern District of Florida, which has been stayed pending resolution of ADM's petition to vacate. Opp. at 2 n.2. Mr. Paillardon did not file a certified copy of the award in support of that petition until after ADM filed the petition to vacate, and thus this Court obtained jurisdiction over the petition to vacate before the Southern District of Florida obtained jurisdiction over the petition to confirm. *Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1292 & n.3 (11th Cir. 2004); *see also Pollution Prevention Servs. v. Inter Recycling Inc.*, 1996 WL 378990, at *8 (M.D. Fla. July 1, 1996) ("[S]ubject matter jurisdiction is required to satisfy the 'first-filing rule.'"). In any event, the machinations leading up to these filings is irrelevant, as Mr. Paillardon has agreed that the merits of ADM's petition to vacate should be resolved by this Court.

*Commercial Workers, Local 1546 v. Ill.-Am. Water Co.*, 569. F.3d 750, 755 (7th Cir. 2009) (quotation marks omitted).

In response, Mr. Paillardon argues that (1) ADM cannot seek to vacate the award for grounds recognized by the FAA but not the Convention; (2) the Arbitrator did not find that ADM breached the JVA by refusing to continue to do business with the assistance of ADMV; and (3) ADM's termination of the JVA justifies the $31 million lost profits award. Opp. at 9-23. None of these arguments saves the plainly defective award.[3]

    1.    Mr. Paillardon suggests that ADM cannot avail itself of the grounds for *vacatur* provided by the FAA because the grounds listed in the Convention for refusing to *confirm* an award are exclusive. Opp. at 9-10. Mr. Paillardon makes this argument yet readily concedes that numerous courts in the Seventh Circuit have allowed such arguments for vacatur under the FAA. *Id.* Mr. Paillardon relies on *Baxter International, Inc. v. Abbott Labs.*, 315 F.3d 829 (7th Cir. 2003), Opp. at. 10, for the proposition that parties challenging international arbitration awards cannot invoke the grounds for vacatur provided by the FAA. *Baxter*, however, did not address whether a court may vacate an international arbitration award for grounds listed in the FAA. Indeed, the Seventh Circuit has plainly stated that "[t]he New York Convention . . . contemplates the possibility of the award's being set aside in a proceeding under local law." *Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 478 (7th Cir. 1997); *see* New York Convention art. V(1)(e).

---

[3] Mr. Paillardon also contends that "none of the exhibits referred to by [ADM's memorandum supporting its petition] has in fact been filed with the Court," which "constitutes an independent reason why ADM's petition should be denied." Opp. at 8. On August 27, 2012, ADM filed its petition to vacate the award, as well as a motion for leave to file an oversize memorandum in support of its petition. Dkt. 1, 4. The motion attached ADM's proposed memorandum. Due to difficulties uploading the exhibits, ADM did not file them along with its proposed memorandum. On the advice of the Clerk's Office, ADM waited until its motion was granted to file its exhibits. The motion was granted on October 16, and ADM promptly filed its exhibits on October 17. Dkt. 16, 17. Mr. Paillardon cites no authority justifying denial of ADM's petition under such circumstances.

4

Unsurprisingly, then, district courts in this Circuit have consistently held that "the Convention allows for vacation of [an] award under domestic law, in this case the FAA." *Certain Underwriters at Lloyds London v. BCS Vacation Ins. Co.*, 239 F. Supp. 2d 812, 815 (N.D. Ill. 2003); *Nat'l Educ. Corp. v. Martin*, 1995 WL 622267, at *3 (N.D. Ill. Oct. 20, 1995); *see also Va. Sur. Co., Inc. v. Certain Underwriters at Lloyd's London*, 671 F. Supp. 2d 994, 995 (N.D. Ill. 2009); *Sphere Drake Ins. Ltd. v. Lincoln Nat'l Life Ins. Co.*, 2006 WL 2699270, at *3 (N.D. Ill. Sept. 13, 2006).

2.  As explained in ADM's opening memorandum, the Arbitrator found that ADM breached the JVA by "stopping the performance of the Business." Pet. Ex. 2 (Award at 47). This holding exceeded the Arbitrator's powers because it disregarded "the express terms" of the JVA and the Arbitrator's own finding that under the JVA ADM had "unfettered discretion" to refuse to do business with ADMV's assistance. *Balt. & Ohio Chi. Terminal R.R .v. Wisc. Cent., Ltd.*, No. 93C3519, 1997 WL 51460, at *13 (N.D. Ill. Feb. 3, 1997) (quotation marks omitted); Pet. Ex. 2 (Award at 9 n.4); *see* pp. 1-2, *supra*. In response, Mr. Paillardon contends there is no internal inconsistency because the Arbitrator did not in fact determine that ADM breached the JVA by "stopping the performance of the Business." Opp. at 15-17.[4] ADM sees no reason to resuscitate a potential ground for upholding the award in order to defeat it, and Mr. Paillardon's

---

[4] Mr. Paillardon suggests that the JVA was exclusive as to certain commodities, although he points to no contractual provision requiring exclusivity or finding by the Arbitrator. Opp. at 7-8. Rather, the JVA and other applicable agreements explicitly defined the "Business" as "nonexclusive," Pet. Ex. 1 (JVA at 1), and even specifically contemplated that the parties would directly compete with ADMV, *id.* ¶ 6.1 ("Confidential Information of the Company . . . may be used by any Shareholder in its own separate business activities; provided, however, that . . . no Shareholder may use any Confidential Information developed by the Company in its own separate business in a manner that is competitive with the Company."). Regardless, Mr. Paillardon concedes that the Arbitrator never found the JVA was exclusive. Opp. at 8.

contention in no way diminishes ADM's central point that the Arbitrator found that ADM had "unfettered discretion" under the JVA to stop making sales though ADMV.

    3.    As such, the viability of the award thus hinges on whether ADM's unilateral termination of the JVA in violation of Section 7.2 could possibly give rise to, under the JVA, a loss to Mr. Paillardon of $31 million in anticipated profits—when it is agreed that the JVA did not require ADM to make any sales with ADMV's assistance. And while Mr. Paillardon is right that an arbitrator's findings as to causation are of course entitled to great deference, *see Monee Nursery & Landscaping Co. v. Int'l Union of Operating Engr's, Local 150*, 348 F.3d 671, 678 (7th Cir. 2003); Opp. at 19, there must still be *some* basis for awarding Mr. Paillardon $31 million as a result of ADM's alleged breach. "[I]f [the court] determine[s] that the award itself *cannot logically follow* from the agreement, [it] will refuse to enforce the award." *Arch of Ill.*, 85 F.3d at 1294 (emphasis added). An arbitrator cannot award a claimant damages for "a loss it did not suffer." *Eljer Mfg. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1256 (7th Cir. 1994); *BNSF Ry. Co. v. Bhd. of Maint. of Way Emps.*, 550 F.3d 418, 425 (5th Cir. 2008) ("By not making any finding as to the necessary element of causation, the [arbitrator] essentially ignored a term" of the contract.).

    Here, however, the award not only fails to set forth any basis to support the lost profit damages, but worse yet the findings the Arbitrator *did* make about ADM's "unfettered discretion" are entirely inconsistent with awarding such damages. ADM's termination of the JVA simply could not result in Mr. Paillardon incurring lost profits damages. Even when the JVA was in effect, the Arbitrator found that ADM had "unfettered discretion" to choose not to conduct its sales to Venezuela through ADMV. Pet. Ex. 2 (Award at 9 n.4). Accordingly, even if the JVA remained in effect *to this day*, ADM would still have been at liberty to do precisely

what it did—refuse to conduct any further business with Mr. Paillardon after June 2009 (when Mr. Paillardon gave unsatisfactory answers to ADM's questions concerning his conduct, *see* p. 9, *infra*). If that is permissible under the contract—and the Arbitrator found that ADM had such discretion—then engaging in that conduct can surely not give rise to an award of lost profits which rest on a presumption that such sales would continue. Regardless of whether the JVA was properly terminated, the record evidence establishes that ADM was plainly not going to work with Mr. Paillardon once it determined that it could not trust him as a business partner. *See* Pet. Mem. at 14. And Mr. Paillardon concedes that the $31 million damages figure generally depends on the assumption that, but for the termination of the JVA, ADM would have continued doing business through ADMV exactly as it had in the past. *See* Opp. at 20 (noting that his expert relied on historical performance in estimating future profits).

Mr. Paillardon's contrary argument rests on a counter-intuitive premise: that although ADM had "unfettered discretion" under the JVA to stop sales, had ADM not terminated the JVA, it somehow would have reversed its decision to stop all sales with ADMV's assistance and thus resume business with Mr. Paillardon. Opp. at 17-18. The Arbitrator never adopted this theory, however, and in fact found the opposite—*viz.*, that there was "no doubt of ADM's decision to terminate"; that "ADM decided that it had to end the relationship with [Mr. Paillardon] because it [could] no longer trust him and was not comfortable with his business practices"; that "ADM stated that it decided that they would no longer conduct business through the JVA"; and that ADM instructed that "no sale was to be made through the JVA."[5] Pet. Ex. 2

---

[5] Mr. Paillardon argues that "the Arbitrator found that, had the unilateral termination not taken place, ADM would have continued to perform." Opp. at 22. However, the Arbitrator simply found that there was "no support" for a "no broker's sales adjustment" to the lost profits damages. Pet. Ex. 2 (Award at 51) (emphasis omitted). This paragraph provides no support for

(Award at 17, 43, 44).  The factual record clearly establishes the following.  ADM stopped all sales involving ADMV and Mr. Paillardon, and it also prohibited any sales involving customer broker commissions (which was the central issue Mr. Paillardon addressed in response to ADM's questions) in the limited sales to Venezuelan customers it made over the coming years.  Pet. Ex. 17 (Jansen WD ¶¶ 52-57); Pet. Ex. 36 (Onks WD ¶ 32).  Moreover, having later been told that the use of commissions—a practice that was centrally orchestrated by Mr. Paillardon—violated Venezuelan criminal law, *see* Pet. Ex. 35 (Planchart WD1 ¶¶ 60-84), there is simply no conceivable basis that a major U.S. multi-national corporation like ADM could ever have any future dealings with an individual like Mr. Paillardon.

Mr. Paillardon offers transcript excerpts which he claims suggest that ADM would have continued to make sales through ADMV had it not unilaterally terminated the JVA.  But a review of the testimony fully supports the Arbitrator's findings to the contrary.  For example, Mr. Jansen's testimony was that prior to a June 9, 2009, meeting where Mr. Paillardon provided unsatisfactory answers to ADM's questions about his business practices, ADM had no plans to cease its relationship with Mr. Paillardon.  Opp. Ex. AA at 1667:7-15.  That is, that at the time ADM representatives met with Mr. Paillardon on June 9, they had not considered or decided on alternative arrangements for continuing ADM's sales to Venezuelan customers without the assistance of Mr. Paillardon or ADMV.  Pet. Ex. 17 (Jansen WD ¶ 56).  Rather, Mr. Paillardon pressed for a meeting to address ADM's concerns and was given one last opportunity to provide answers to basic questions regarding the use of "brokers" and the services that they provided,

---

Mr. Paillardon's more ambitious proposition that, but for the termination of the JVA, ADM would have continued to do business with Mr. Paillardon.

which he failed to provide.[6] Pet. Ex. 15 (Graves WD ¶ 42); Pet. Ex. 17 (Jansen WD ¶ 49). Mr. Hart, a damages expert, similarly merely testified that, based on his review of the testimony, that "as of June 2009 [ADM had no] intention to change their flow of business into Venezuela through the joint venture." Opp. Ex. AA at 2333:2-13.[7]

When the evidence Mr. Paillardon relies on is unpacked, then, his apparent argument is that the record establishes that in June 2009, ADM decided to unilaterally terminate the JVA and to cease doing business with Mr. Paillardon and ADMV. Because these two decisions were made around the same time, his argument follows, one therefore caused the other—ADM would not have ceased doing business with Mr. Paillardon had it not terminated the JVA. *See* Opp. at 17-18. That dubious logic is not supported by *a single piece* of evidence in the record, and contradicts the Arbitrator's own findings that ADM unambiguously determined that it wanted nothing to do with Mr. Paillardon after June 2009. *See* pp. 7-8, *supra*; Pet. Exs. 15, 17 (Graves WD ¶¶ 45, 47; Jansen WD ¶¶ 51-53).

Mr. Paillardon finally sets forth a host of reasons disputing ADM's motive to cease doing business through ADMV. *See* Opp. at 20 (arguing that the JVA was profitable, no improper

---

[6] The material cited by Mr. Paillardon in footnote 26 similarly does not support this proposition. Opp. at 18 n.26. Opp. Ex. AA at 1610:17-1612:25 (Jansen testifies "up through . . . the time these issue arose . . . ADM wasn't looking to get rid of Mr. Paillardon"); *id.* at 1663:16-1667:15 (Jansen testifies that before June 9 there were "serious questions" about conducting business with Mr. Paillardon); *id.* at 1780:25-1781:21 (Martinez testifies that before June 9, 2009, he was "not aware of any internal plan" to stop doing business with Mr. Paillardon); *id.* at 1657:15-1658:11 (Jansen testifies that before the June 9 he believed ADM would do business through ADMV so long as brokers passed "due diligence" and signed "written contracts"); Opp. Ex. O ¶ 49 (Jansen states it was his "hope" that June 9 meeting would go well so ADM could continue to do business with Mr. Paillardon).

[7] Mr. Paillardon also states that Mr. Hart used the same ten-year damages model as Mr. Paillardon's expert. Opp. at 18. However, Mr. Hart was merely addressing Mr. Paillardon's proposed ten-year model; he never conceded that the model was an appropriate measure of damages. Pet. Ex. 38 (Hart WD ¶ 85).

business practices were discovered, and that Mr. Paillardon was young at the time of the termination). This evidence describes reasons why it was in ADM's economic interest to *not* terminate the JVA and to *not* cease doing business with ADMV's assistance—but it does not address the fact that ADM *did* decide to terminate the JVA and stop all business with ADMV. Nor does it speak to whether ADM's termination caused Mr. Paillardon's damages. And most importantly, such evidence does not diminish the critical point as found by the Arbitrator—that under the contractual provisions of the JVA, ADM retained "unfettered discretion" to discontinue sales through the use of ADMV and Mr. Paillardon.

At bottom, the Arbitrator never explained why ADM's termination of the JVA caused Mr. Paillardon's damages when the Arbitrator also found that as of June 2009, ADM unequivocally had decided to stop making sales with the assistance of ADMV, which was its contractual right. *See* pp. 1-3, 7-8, *supra*. It is not surprising that no explanation is included in the award—any purported explanation would be inconsistent with the Arbitrator's own contractual findings. Even now Mr. Paillardon cannot (and does not) offer a credible theory in defense of the award as to how the breach of Section 7.2 caused his damages, much less cite any evidence supporting such a theory. It is evident that the Arbitrator's $31 million lost profits award did not "draw its essence" from the parties rights and obligations under the JVA, but instead from the Arbitrator's "own brand of industrial justice." *United Food*, 569 F.3d at 754-55 (quotation marks omitted); *Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006). In so doing, the Arbitrator exceeded his powers and the $31 million award must be vacated.

### B. The Arbitrator Exceeded His Powers And Contravened Public Policy By Encouraging Unlawful Conduct

The $31 million award must additionally be vacated because it contravenes Venezuelan law and public policy, as well as the public policy of the United States. 9 U.S.C. § 10(a)(4);

New York Convention art. V(2)(b). In its opening memorandum, ADM detailed a number of highly troubling transactions uncovered as a result of its investigation into Mr. Paillardon's business practices. Pet. Mem. at 9-14. Tellingly, Mr. Paillardon does not attempt to explain why the transactions ADM identified were legitimate. Instead, he relies on a number of unavailing arguments unrelated to the legality of his conduct.

*First*, Mr. Paillardon argues that the Arbitrator "simply awarded damages" and did not directly order ADM to violate any law. Opp. at 25. But courts have routinely entertained claims that a damages award violates public policy, such as by rewarding unlawful conduct or discouraging businesses from reporting unlawful conduct—without suggesting that a damages award could never violate public policy. *See, e.g., In re Fifth Third Bank, N.A.*, 716 S.E.2d 850, 857 (N.C. App. 2011); *Air Line Pilots Ass'n, Int'l v. Trans States Airlines, LLC*, 692 F. Supp. 2d 1105, 1114 (E.D. Mo. 2010); *Kenneth H. Hughes, Inc. v. Aloha Tower Dev., Corp.*, 654 F. Supp. 2d 1142, 1153 (D. Haw. 2009); *MCI Constructors, Inc. v. Hazen and Sawyer, P.C.*, 2009 WL 632930, at *10 (M.D.N.C. Mar. 9, 2009); *Sawtelle v. Waddell & Reed, Inc.*, 304 A.D.2d 103, 115, (N.Y. App. 2003). Nor does Mr. Paillardon cite any authority holding otherwise. Indeed, courts have vacated damages awards on the grounds that such awards can have a "chilling effect" on behavior that public policy encourages. *Barclays Capital Inc. v. Shen*, 857 N.Y.S.2d 873, 877, 879 (N.Y. Sup. 2008). Here, as explained in ADM's opening memorandum and largely undisputed by Mr. Paillardon, ADM uncovered a number of transactions entered into by Mr. Paillardon in violation of Venezuelan foreign exchange control regulations. Pet. Mem. 9-14, 26-28. The Arbitrator's $31 million award rewards Mr. Paillardon for his unlawful conduct and discourages ADM from doing precisely what a United States company operating abroad should

11

do in such situations—cease doing business with people when you think they are engaging in unlawful business practices.

*Second*, Mr. Paillardon argues that ADM has not shown that the award violates the public policy of the United States, rather than just Venezuela. Opp. at 26-27. However, "[i]t is well-settled that in the interest of international comity, this Court should not enforce an award in a country that would result in the violation of the law of that country." *Venture Global Eng'g LLC v. Satyam Computer Servs.*, 233, F. App'x 517, 523 (6th Cir. 2007). As explained above, enforcing the award (i.e., transferring money to a resident of Venezuela) violates the public policy of Venezuela, and that policy is entitled to respect in a United States court. Mr. Paillardon cites *Slaney v. International Amateur Athletics Federation*, 244 F.3d 580, 593 (7th Cir. 2001), in support of the contrary proposition, but *Slaney* did not involve the issue of when the public policy of a foreign nation justifies vacatur of an international arbitration award in a United States forum.

*Third*, Mr. Paillardon argues that Venezuela's foreign exchange control regulations do not constitute a "fundamental," "well-defined" public policy of Venezuela. Opp. at 27-28. Mr. Paillardon contends that the alleged misconduct should be ignored because of a change in Venezuelan law that occurred in September 2011. *Id.* In so doing, Mr. Paillardon misconstrues ADM's argument as well as the relevant expert testimony. As ADM made clear to the Arbitrator, the September 2011 change in currency control regulations—which removed the requirement that commissions be itemized in invoices—in no way cured the illegality. That's because, as ADM's expert explained, Venezuelan law simply does not permit a customer to obtain U.S. dollars for payment of its own broker even if that payment is itemized in the invoice. *See* Pet. Ex. 35 (Planchart WD1 ¶ 75, n.28); Reply Pet. Ex. 1 (Corrected Hearing Tr. at 2190:22-

24); Pet. Ex. 37 (Planchart WD2 ¶ 70); Opp. Ex. EE at ¶ 61. Accordingly, the practice at issue plainly violated Venezuelan law.

*Finally*, Mr. Paillardon argues that the Arbitrator's finding that there was no CADIVI violation is dispositive. Opp. at 29. However, the question of whether an award violates public policy "is ultimately for the courts" and "a court need not, in fact cannot, enforce an award which violates public policy." 4 Thomas H. Oehmke, *Commercial Arbitration* § 150:1 (2012); *cf. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Union Local # 7 v. Associated Gen. Contractors of Mass., Inc.*, 489 F.3d 75, 78-79 (1st Cir. 2007); *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200, 1214 (9th Cir. 1989) (en banc) (plurality). In contesting this hornbook rule, Mr. Paillardon relies on *Baxter v. Abbott Laboratories*, 315 F.3d 829 (7th Cir. 2003). But the court in *Baxter* merely rejected a public policy claim which, if true, would "just be another way of saying that antitrust matters are not arbitrable." *Id.* at 832. It did not foreclose courts from reviewing public policy determinations by arbitrators outside the antitrust context—for instance, from reviewing awards requiring reinstatement of a drunken airline pilot or a teacher with a history of sexual abuse, despite findings by the arbitrator that reinstatement was consistent with public policy. *See Stead Motors*, 886 F.2d at 1214; *Baxter*, 315 F.3d at 832 (discussing unique context of enforcement of antitrust laws). Indeed, Mr. Paillardon's interpretation of *Baxter* puts the opinion in conflict with Supreme Court precedent. *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983) ("[T]he question of public policy is ultimately one for resolution by the courts."). Accordingly, the $31 million award should be vacated under the FAA and the New York Convention as violative of public policy.

### C. The Arbitrator Disregarded Multiple Defenses

In addition to ignoring the relevant contracts and contravening public policy, the Arbitrator wholly failed to address two other important defenses: that the relevant agreements created a "mercantile mandate" which was terminable at will, and that Mr. Paillardon failed to mitigate his damages. Pet. Mem. 29-30. Mr. Paillardon does not dispute that the Arbitrator ignored both defenses. Opp. at 31 (Arbitrator "implicitly" rejected mercantile mandate defense); *id.* at 33 (Arbitrator was "under no duty" to address mitigation). The Arbitrator's disregard of these defenses exceeded his powers, and put together with all of the other transgressions in the award, it additionally justifies an "infer[ence] that the [A]rbitrator[]" decided this case due to an "evident partiality" or at least exceeded his powers. *Wise*, 450 F.3d at 269.

## II. THE ENTIRE AWARD MUST BE VACATED

As chronicled above, the Arbitrator's award is riddled with egregious errors and abuses of the Arbitrator's power. Because these transgressions justify an "infer[ence] that the [A]rbitrator[]" decided this case due to an "evident partiality" or at least exceeded his powers, they merit vacatur of the *entire* award. *Wise*, 450 F.3d at 269. Accordingly, the Court should vacate the entire award.

## CONCLUSION

For the foregoing reasons, the arbitration award should be vacated.

Respectfully submitted,

ARCHER-DANIELS-MIDLAND COMPANY and
ADM LATIN AMERICA, INC., Petitioners,

BY: FEATHERSTUN, GAUMER, POSTLEWAIT,
STOCKS, FLYNN & HUBBARD,

BY: /s/ Jerrold H. Stocks
Jerrold H. Stocks
ARDC No.: 06201986

FEATHERSTUN, GAUMER, POSTLEWAIT,
STOCKS, FLYNN & HUBBARD
225 N. Water St., Suite 200
P. O. Box 1760
Decatur, Illinois  62525
Telephone:  (217) 429-4453
Fax:  (217) 425-8892
E-Mail:  jstocks@family-net.net
        jstocks@centralillaw.com

Jon G. Fetterolf
Ryan McCarthy
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
Fax:  (202) 434-5029
E-Mail:  jfetterolf@wc.com
E-Mail:  rmccarthy@wc.com

CERTIFICATE OF SERVICE

      I certify that on October 26, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM-ECF System which will send notification of such filing to the following. I also sent the foregoing by e-mail and deposited a copy of the foregoing in a U. S. Post Office Box at 225 North Water Street, Decatur, Illinois, enclosed in an envelope with proper postage prepaid, addressed to the following: (All exhibits or other documents for which filing under seal is requested have been served upon the following counsel by regular mail and e-mail.)

Anthony B. Ullman
Salans, LLP
Rockefeller Center
620 Fifth Avenue
New York, NY 10020
VIA E-MAIL: aullman@salans.com

      /s/ Jerrold H. Stocks
Jerrold H. Stocks
ARDC No.: 06201986
FEATHERSTUN, GAUMER, POSTLEWAIT, STOCKS, FLYNN & HUBBARD
225 N. Water St., Suite 200
P. O. Box 1760
Decatur, Illinois 62525
Telephone: (217) 429-4453
Fax: (217) 425-8892
E-Mail: jstocks@family-net.net
      jstocks@centralillaw.com

Jon G. Fetterolf
Ryan McCarthy
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Fax: (202) 434-5029
E-Mail: jfetterolf@wc.com
E-Mail: rmccarthy@wc.com