**E-FILED**
Tuesday, 06 November, 2012  06:46:49 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| ARCHER-DANIELS-MIDLAND COMPANY AND ADM LATIN AMERICA, INC., <br><br> Petitioners, <br><br> v. <br><br> REGIS PAILLARDON, <br><br> Respondent. | ) <br> ) <br> ) <br> ) <br> )   Case No.: 2:12-cv-02227-MPM-DGB <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

---

**RESPONDENT REGIS PAILLARDON'S
SUR-REPLY MEMORANDUM OF LAW IN OPPOSITION
TO PETITIONERS' PETITION TO VACATE ARBITRAL AWARD**

---

BECKETT & WEBBER, P.C.
Andrew W. B. Bequette
508 S. Broadway Avenue
P.O. Box 17160
Urbana, IL 61803-7160
Tel: 217-328-0263
Fax: 217-328-0290
andrew@beckettwebber.com

– and –

SALANS LLP
Anthony B. Ullman (Bar No. 1981349)
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: 212-632-5500
Fax: 212-632-5555
aullman@salans.com

1557234

# TABLE OF CONTENTS

A.      ADM's Arguments that the Arbitrator "Exceeded" his Authority by Failing
        to Interpret the Contract Are Baseless ...............................................................................1

B.      ADM's Arguments that Enforcement of the Award would Violate Public
        Policy Are Baseless...........................................................................................................9

C.      ADM's Arguments that the Arbitrator "Ignored Defenses" Are Baseless .......................14

CONCLUSION..........................................................................................................................15

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

Affymax, Inc. v. Ortho-McNeil Janssen Pharms., Inc.,
        660 F.3d 281 (7th Cir. Ill. 2011)................................................................2, 3, 11

Air Line Pilots Ass'n, Int'l v. Trans States Airlines, LLC,
        692 F.Supp.2d 1105 (E.D. Mo. 2010)................................................................10

Anheuser-Busch, Inc. v. Local Union No 744, IBT,
        280 F.3d 1133 (7th Cir. Ill. 2002)......................................................................2

Arch of Ill. v. District 12, UMW,
        85 F.3d 1289 (7th Cir. Ill. 1996)........................................................................3

Baxter Int'l, Inc. v. Abbott Labs.,
        315 F.3d 829 (7th Cir. Ill. 2003)......................................................................13

Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. v. Union Pac. R.R. Co.,
        522 F.3d 746 (7th Cir. Ill. 2008)........................................................................2

BEM I, LLC v. Anthropologie, Inc.,
        2000 WL 18949574 (N.D. Ill. Dec. 14, 2000)....................................................8

Eljer Mfg., Inc. v. Kowin Devel. Corp.,
        14 F.3d 1250 (7th Cir. Ill. 1994)....................................................................5, 8

Ethyl Corp. v. United Steelworkers of America, AFL-CIO-CLC,
        768 F.2d 180 (7th Cir. Ind. 1985)......................................................................2

Flexible Mfg. Sys. PTY v. Super Prods. Corp.,
        86 F.3d 96 (7th Cir. Wis. 1996)..........................................................................7

George Watts & Son v. Tiffany & Co.,
        248 F.3d 577 (7th Cir. Wis. 2001)......................................................................2

Gingiss Int'l v. Bormet,
        58 F.3d 328 (7th Cir. Ill. 1995)..........................................................................7

Halim v. Great Gatsby's Auction Gallery, Inc.,
        516 F.3d 557 (7th Cir. Ill. 2008)........................................................................7

Holden v. Deloitte & Touche, LLP,
        390 F.Supp.2d 752 (N.D. Ill. 2005)..............................................................8, 14

1557234

IDS Life Ins. Co v. Royal Alliance Assocs.,
    266 F.3d 645 (7th Cir. Ill. 2001) ............................................................7

Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Union Local #
    7 v. Associated Gen. Contr. of Mass., Inc.,
    489 F.3d 75 (1st Cir. Mass. 2007) ...................................................13

Kenneth M. Hughes, Inc. v. Aloha Tower Dev., Corp.,
    654 F.Supp.2d 1142 (D. Haw. 2010) ...............................................10

Major League Baseball Players Ass' v. Garvey,
    532 U.S. 504 (U.S. 2001)...................................................................2

MCI Constructors, Inc. v. Hazen and Sawyer, P.C.,
    Index Nos. 1:99CV2, 1:02CV396, 2009 WL 632930 (M.D.N.C. March 9, 2009) ..........12

Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, etc.,
    886 F.2d 1200 (9th Cir. Cal. 1989).................................................13

United Food & Commer. Workers, Local 1546 v. Illinois-America Water Co.,
    569 F.3d 750 (7th Cir. Ill. 2009) ......................................................2

United Paperworkers Int'l Union V. Misco, Inc.
    484 U.S. 29 (U.S. 1987)...................................................................5

United Steelworkers of America v. Enterprise Wheel & Car Corp.,
    363 U.S. 593 (U.S. 1960)...............................................................2, 3

Williams v. Katten, Muchin & Zavis,
    1996 WL 717447 (N.D. Ill. Dec. 4, 1996) ....................................5, 8

Wise v. Wachovia Sec., LLC,
    450 F.3d 265 (7th Cir. Ill. 2006) ....................................................14

### STATE CASES

Barclays Capital Inc. v. Shen,
    20 Misc. 3d 319, 857 N.Y.S.2d 873 (N.Y. Sup. Ct. 2008) ................10

In re Fifth Third Bank, Nat'l Ass'n,
    716 S.E.2d 850 (N.C. Ct. App. 2011) .............................................10

Sawtelle v. Waddell & Reed, Inc.,
    304 A.D.2d 103, 754 N.Y.S.2d 264 (N.Y. App. Div. 1st Dep't 2003).............................10

1557234

## FEDERAL STATUTES

9 U.S.C. § 10  ..........................................................................................................................8

1557234

ADM's proposed oversized reply memorandum ("Reply") only further confirms that its arguments on this motion fall far short of the exacting legal standard that must be met to vacate an arbitral award. Those arguments both ignore the clear legal principles that govern a motion to vacate and impermissibly seek to re-argue, de novo, factual and legal matters that ADM already argued before the Arbitrator and lost. We address these points briefly below.

### A.   ADM's Arguments that the Arbitrator "Exceeded" his Authority by Failing to Interpret the Contract Are Baseless

In its opening brief, ADM argued that the Arbitrator had exceeded his powers by failing to interpret the contract in two ways: (a) by finding that ADM had, in addition to committing breach by unilaterally terminating the JVA in contravention of Section 7.2 thereof, independently breached the JVA by "stopping its performance" under that contract notwithstanding his finding that ADM had discretion to do that and (b) by awarding Paillardon damages for ADM's breach of Section 7.2. (ADM MOL, 20-21.)[1] In our response, we demonstrated how both arguments lacked any merit. (Opp. MOL, 10-23.)

In its (Reply at 1), ADM effectively concedes that its argument on breach by "stopping performance" was specious, and states that ADM is no longer pressing it. However, ADM continues to argue that the Arbitrator exceeded his authority by awarding Paillardon damages for its breach of JVA Section 7.2—based, again, on its contention that, under the JVA, ADM had discretion to cut off supply. That argument, which confuses the **existence** of discretion with the **exercise** of discretion, is not only untenable but indeed frivolous.

---

[1] Capitalized terms not defined herein shall have the same meaning as that ascribed to them in the Paillardon Memorandum of Law in Opposition to ADM's Petition to Vacate Arbitration Award, dated October 12, 2012 ("Opposition MOL" or "Opp. MOL").

1

1.      At the outset, the legal standard for whether an arbitrator exceeded his powers—

which ADM inexplicably fails to cite or even acknowledge—is clear.  As the Supreme Court has

stated, "if an arbitrator is **even arguably** construing or applying the contract and acting within

the scope of his authority, the fact that a court is convinced he committed serious error does not

suffice to overturn his decision."  Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504,

509 (2001) (emphasis added).  Thus, the question before a court is not whether the arbitrator

erred, or even grossly erred, in interpreting the contract; "it is **whether** [he] interpreted the

contract."  Affymax, Inc. v. Ortho-McNeil Janssen Pharmaceuticals Inc., 660 F.3d 281, 286 (7th

Cir. 2011); Bd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment v. Union Pac.

R.R., 522 F.3d 746, 757 (7th Cir. 2008) (emphasis added); see also cases cited in Opp. MOL at

pp. 9-12.

In this regard, the courts have recognized that disappointed litigants can, and often do,

argue that because an arbitrator allegedly failed to properly interpret a contract, his award fails to

draw its essence from the contract.  Ethyl Corp. v. United Steelworkers of America, AFL-CIO-

CLC, 768 F.2d 180, 184 (7th Cir. 1985).   But such argument has been consistently rejected.

Rather, it is "only when the arbitrator **must** have based his award on some body of thought, or

feeling, or policy, or law that is **outside the contract**  . . . that the award can be said not to draw

its essence from the parties' agreement."  United Food & Comm. Workers, Local 1546 v. Illinois

Am. Water Co., 569 F.3d 750, 755 (7th Cir. 2009) (emphasis added) (citing Ethyl, 768 F.2d at

184-85).[2]

---

[2] See also United Steelworkers, 363 U.S. at 597 (for arbitral award not to draw its essence
from the contract, the arbitrators' "**words** [must] manifest an infidelity" to it) (emphasis added);
George F. Watts & Son, Inc. v. Tiffany & Co., 248 F.3d 577, 579 (7th Cir. 2001) ("[i]f the
parties specify that their dispute is to be resolved under Wisconsin law, then an arbitrator's

2

That test is not easily met.  A "mere ambiguity" in the award—even one that "permits the **inference** that the arbitrator may have exceeded his authority"—is not enough.  United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S 593, 598 (1960) (emphasis added); Affymax, 660 F.3d at 285; Arch of Ill. v. District 12, UMW, 85 F.3d 1289, 1292-1293 (7th Cir. 1996).  It likewise is not enough if the award is silent on the issue.  Affymax, 660 F.3d at 285.  Further, any doubt as to whether an arbitrator exceeded his power must be resolved in favor of **enforcing** the award.  United Steelworkers, 363 U.S. at 597-98; cases cited in (Opp. MOL at pp. 12, 18 n.27).

In this case, the Arbitrator stated, explicitly, that in making his award of damages he was assessing the damages caused by ADM's breach of Section 7.2 of the JVA—which is precisely what he did.  (Award [**A**]³ ¶¶ VI.7.1, VI.7.3, VI.7.7-9, VIII.1-10.)  Under the controlling precedent cited above and in Paillardon's Opposition MOL (at pp. 9-12, 14), that ends the inquiry and requires that ADM's motion be denied.

Arch of Ill., 85 F.3d 1289, cited in ADM (Reply at p. 6), is fully consonant.  There, the Court stated that, if the arbitrator had found that respondent had just cause to discharge the claimant but stated something to the effect that fairness required a different result, the award

---

**declaration** that he **prefers** New York law, or no law at all," would result in the arbitrator exceeding his authority) (emphasis added); Anheuser-Busch, Inc. v. Local Union No 744, 280 F.3d 1133, 1136 (7th Cir. 2002) (award properly vacated where arbitrator "did not merely misread the contract" but "**admitted** in his decision that he was going **outside** the very terms of the written contract" and basing the award on his "personal views of fairness") (emphasis added).  No such words, declarations or admissions are present in the Award here.

³ References to the documentary sources relied on herein are made to their abbreviated titles listed in the table of abbreviations included in Opposition MOL and, also, in brackets, to the applicable exhibit attached to the Declaration of Anthony Ullman, dated October 12, 2012 submitted in conjunction with the Opposition MOL.  For example, a reference to paragraph I the arbitral award is as follows: "Award [**A**] ¶ I."

3

would not have drawn its essence from the contract; however, since no such finding or statement was made, the award could not be vacated.

Likewise, here, the Arbitrator did **not** find that, if the unilateral termination had not taken place, ADM would have stopped performing, and he did **not** state that, notwithstanding such finding, "fairness" required that damages be awarded.  Rather, the Arbitrator accepted the evidence and arguments proffered by Paillardon that, if the unilateral termination had not taken place and ADM remained a partner under the JVA, given that no illegality was found, ADM would have **continued** performing in the future, similar to the way it had performed over its nine-year history in the past.  (See Opp. MOL, 17-18, 22.)  While ADM argues that there is an "internal" or "logical" inconsistency in the Arbitrator's reasoning (Reply, 5-6), that is not so. There is no inconsistency between a determination that ADM had discretion to stop performing and a determination that such discretion would not have been exercised.  While ADM obviously feels that the Arbitrator's determination on the latter issue was incorrect, that is not reviewable on a motion to vacate.  (See Opp. MOL, 9-12; pp. 7-8 below.)

2.       While the foregoing is dispositive, ADM's efforts to rehash the merits of the damages assessment (See Reply, 8-10) are themselves incomplete and misleading.  We respectfully refer the Court to pp. 17-21 of Paillardon's Opposition MOL, and further note the following:

-- while ADM asserts that, prior to the termination, it had stopped all sales and all use of brokers (Reply, 8), it **omits** that the Arbitrator found that the pre-termination stoppage was only a temporary suspension (Award [**A**] ¶¶ III.9.15-16 [both paragraphs]; Opp. MOL, 17 n.25);

-- while ADM suggests that it believed some of the transactions with brokers were in violation of the Venezuelan currency laws and regulations (Reply, 8), it **omits** to note that (a) this contention was first made in to the witness statement of its Venezuelan law expert in the arbitration, which was not prepared until 2011—more than two years **after**

4

the unilateral termination had taken place—and (b) the **contemporaneous** evidence was that ADM has itself checked on whether any broker-related payments were in violation of the currency regulations and concluded that they were **not** (Award [**A**] ¶¶ VI.3.25, VI.3.27.)  ADM further **omits** that the determination of the Arbitrator was the same— there were **no** illegalities involved.  (Award [**A**] ¶¶ VI.3.42; VI.3.43; VI.3.45; VI.3.47; Opp. MOL, 7, 20, 25 & n.35);

      -- while ADM refers to the June 9, 2009 meeting as giving Paillardon "one last opportunity" to explain the use of brokers and the services they provided,[4] it omits that Paillardon told them he had little information about any of the individual brokers (Jansen, Tr., 1673:11-1676:1, attached as Exhibit 1 hereto) and that ADM was itself in the process of conducting its own, independent due diligence investigations on the brokers—which, at the time of the unilateral termination, was still in its early stages (Opp. MOL, 4);

      -- ADM omits that, as of the time of the unilateral termination, it had found **no** improper payments to brokers or even any that seemed suspicious.  (Opp. MOL, 7, 20); and

      -- while ADM argues that, if the unilateral termination had not taken place, it could, while remaining as a party to the JVA, have exercised discretion and stopped supplying product, ADM cites **no testimony** stating that ADM **would in fact have done so**.  None exists.[5]  Likewise, the statements referred to by ADM on (p. 7 of its Reply) recite only the tautology that, having decided to unilaterally terminate the JVA, ADM would no longer do business through the JVA.[6]  Those statements do **not** speak to what ADM would have done if the wrongful termination had **not** taken place.

_____

[4] ADM does not explanation why it refers to this as "one last opportunity."  The uniform testimony from the ADM witnesses is that, prior to the June 9 meeting, it had no plans to change the way it was doing business in Venezuela or its relationship with Paillardon.  (See Opp. MOL, 17-18.)

[5] Even if the Court were to assume, <u>arguendo</u>, that some testimony from the ADM witnesses supported ADM's claim that it would have stopped performing had the unilateral termination not taken place, the Arbitrator plainly did not credit any such testimony.  Credibility determinations are within the province of the arbitrator and are not subject to judicial review. <u>Eljer</u>, 14 F.3d at 1255; <u>United Paperworkers Int'l Union V. Misco, Inc</u>, 484 U.S. 29 at 45; <u>Williams v. Katten, Muchin & Zavis,</u> 1996 WL 717447, *6 (N.D. Ill. 1996).

[6] Also, contrary to ADM's assertion, the statement that "ADM decided that it had to end the relationship with [Mr. Paillardon] because it [could] no longer trust him and was not comfortable with his business practices" (Reply, 7) did **not** constitute a factual finding made by the Arbitrator as to ADM's reasons for the unilateral termination.  Rather, the statement recounted the communication made by ADM's Mr. Jansen to Paillardon.  (Award [A], ¶ VI.4.13.)  In fact, while ADM's underlying motivation for the unilateral termination was hotly contested, the Arbitrator ultimately did not reach that issue and made no findings on it.  (See Opp. MOL, 7.)

Paillardon's damages calculations were grounded on the proposition that, if ADM had not rashly and improperly unilaterally terminated the JVA but remained a JV partner with the contract still in force, it would have completed the due diligence that it had already begun, confirmed that there were no problems with the brokers, established written contracts with them and continued to do business with them, as well as business through the JVA in general, consistent with its prior statements and representations.  (Award [**A**], ¶ VIII.1-3.)

ADM's own damages expert, Mr. Hart, testified on cross-examination that, if the wrongful termination had not taken place, ADM would have continued its due diligence of the brokers, that, if the brokers passed due diligence, they would have been presented with written contracts, and that, according to what ADM was telling Paillardon at the time (which Hart had no reason to believe was not true), assuming the brokers signed the contract, ADM would have continued to do business with them.  (Hart, Tr. [**AA**], 2362:22-2364:25.)  Mr. Hart further testified:

> Q. Okay. So if the termination hadn't taken place and ADM had gone ahead and the brokers had passed due diligence and the brokers who passed due diligence had then signed written contracts, is it correct that, at least according to what ADM at the time was telling Paillardon, ADM would have continued to do business using those brokers?
>
> A. **If all those things happened, that's true**.  (Hart, Tr. [**AA**], 2364:15-25.) (Emphasis added.)

After hearing all the evidence, the Arbitrator accepted the damages calculations presented by Paillardon—which, as set forth above, assumed that, if the unilateral termination had not taken place, ADM would have continued to do business through the JV.  Further, in ¶ VIII.3 of his Award, the Arbitrator expressly **found** that there was "**no support**" for ADM's contention that, if the unilateral termination had not taken place, it would have "stopped all transactions that involved brokers."  Quite the contrary, he expressly **found** that "ADM was prepared to **continue**

6

transactions with brokers" after the due diligence had been completed and written contracts signed.  (Id.)  (Emphasis added.)[7]  Thus, in his factual findings, the Arbitrator explicitly concluded that, if the unilateral termination had not taken place, ADM would **not** have stopped performing through the joint venture, as ADM now contends.

Thus, there is no question that the Arbitrator determined that, irrespective of whether it had discretion to stop supplying product to the joint venture, if the unilateral termination in violation of Section 7.2 had not taken place, ADM would not have exercised that discretion but would have continued doing business through the joint venture, consistent with the way it had in the past.  ADM's repeated assertions that, in his damages assessment, the Arbitrator was not interpreting the contract, but rather deliberately departing from it and instead employing his own brand of extra-contractual justice, is not only baseless but frivolous.

3.     In the final analysis, ADM's argument boils down to its contentions that Paillardon did not suffer any actual loss and that the Arbitrator should have accepted its evidence and arguments on that, not Paillardon's.  (Reply, 6.)  However, as ADM is well aware, "[f]actual or legal error, no matter how gross, is insufficient to support overturning an arbitration award." Halim v. Great Gatsby's Auction Gallery, Inc., 516 F.3d 557 (7th Cir. Ill. 2008), 516 F.3d at 563; IDS Life Ins. Co v. Royal Alliance Assocs., 266 F.3d 645, 650 (7th Cir. Ill. 2001) (on motion to vacate, court cannot inquire as to whether arbitrator's award was "correct or even reasonable") (Opp. MOL, 9, 11-12.)

_____

[7] ADM's effort to characterize these findings as limited to Mr. Hart's "no broker" adjustment (Reply, 7 n.5), is unavailing.  As an integral part of his damages calculations, Paillardon's damages expert, Mr. Perez, projected continued sales, by the JV, using brokers for the duration of the 10-year damages period.  Mr. Hart argued that no sales involving brokers would take place.  The Arbitrator rejected the argument by Mr. Hart and found that, but for the unilateral termination, sales by the joint venture involving brokers would have continued for the full 10 years.

As stated in the Paillardon Opposition MOL (at 19), that principle applies equally to alleged errors in damages assessments.  For example, in <u>Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.</u>, 86 F.3d 96, 100 (7th Cir. 1996), the losing party argued that the arbitrators had exceeded their authority in awarding damages based on the contention that that party itself had terminated the subject license agreement, which rendered the award of lost profits for periods following the termination invalid. The Court squarely held that this argument was insufficient on a motion to vacate:  "It was for the arbitrator to decide who breached the agreement first, and **what damages were recoverable as a consequence**.  The panel did so, and **that was the end of it**." (<u>Id.</u>) (emphasis added.)  <u>See also</u> <u>Gingiss Int'l v. Bormet</u>, 58 F.3d 328, 333 (7th Cir. 1995) (respondents' arguments that "[claimant] failed to prove any damages caused by the [respondents] are nothing more than thinly veiled attempts to obtain appellate review of the arbitrator's decision, which is not permitted under the FAA"); <u>Eljer Mfg., Inc. v. Kowin Devel. Corp.</u>, 14 F.3d 1250, 1256 (7th Cir. 1994) (rejecting motion to vacate based on contention that multi-million dollar award lacked evidentiary support; "[i]nsufficiency of the evidence is not one of the grounds" for vacating an award as set forth in 9 U.S.C. § 10); <u>Holden v. Deloitte and Touche, LLP</u>, 390 F. Supp.2d 752, 774-77 (N.D. Ill. 2005) (rejecting argument that arbitrator made improper finding on loss causation, since "arbitration awards can be wrong and that is not a basis to vacate them").[8]

ADM's arguments are in plain contravention of these settled precepts.

---

[8] <u>Accord</u>, <u>BEM I, LLC v. Anthropologie, Inc.</u>, 2000 WL 18949574, *8-*9 (N.D. Ill. 2000) (rejecting argument that award should be vacated because arbitrator had no basis to award lost profits); <u>Williams v. Katten, Muchin & Zavis</u>, 1996 WL 717447, *6 (N.D. Ill. 1996) ("It is not this Court's responsibility to review evidentiary-based challenges or to speculate as to the arbitrators' reasoning for its award of damages. . . .  Assessing damages was the job of the arbitration panel").

1557234

### B. ADM's Arguments that Enforcement of the Award would Violate Public Policy Are Baseless

ADM's "public policy" arguments largely restate its prior arguments. We address them, briefly, in the order in which they appear.

(a) ADM argues that Paillardon "failed to explain" why the broker-related transactions that ADM asked questions and then investigated about "were legitimate." (Reply, 11.) However, as ADM is well aware, to prevail on its "public policy" argument, **it** must show that enforcement of the Award would violate public policy. ADM's argument that the award should be vacated on public policy grounds because Paillardon did not sufficiently "explain" to the Court why the payments at issue were indeed proper, or why the Arbitrator's ruling on ADM's currency exchange-related arguments were indeed correct, does not even remotely address the relevant standard and is frivolous.[9]

(b) In its opening brief (at 25, 26), ADM argued that enforcement of the Award would violate public policy because it requires the parties to violate the law. Now conceding that it does no such thing, but awards damages only, ADM asserts that enforcement would violate public policy because it "discourages businesses from reporting illegal conduct," "rewards Mr. Paillardon for his unlawful conduct" and "discourages ADM" from ceasing to do business with persons whom they think are engaging in unlawful business practices. (Reply, 11-12.) That argument lacks any legal foundation and is wholly specious.

---

[9] In the Arbitration, the ADM witnesses conceded that, notwithstanding its investigation, it had found no evidence of any improper payments. (Opp. MOL, 7, 20.) The only "illegality" that ADM asserted was alleged illegality relative to the exchange regulations—an allegation that was first made, long after the wrongful termination, in the course of the Arbitration through the testimony of ADM's Venezuelan law expert and which the Arbitrator found to be **without merit**. (See pp. 4-5 above.) To the extent ADM is contending that, on this motion to vacate, it is Paillardon's burden to reargue the merits of an issued arbitral award lacks any colorable support and misstates the law.

9

To begin, ADM's argument depends on the essential predicate that Paillardon was engaged in improper conduct.  The Arbitrator, however, found the opposite—that no illegalities had occurred.  The law is clear that, in considering whether enforcement of an award would violate public policy, the question is not whether the underlying conduct violates public policy, but whether the **enforcement** of the **award** does.  (See Opp. MOL, 23-24; accord, T. Oehmke, Commercial Arbitration (2012) (relied on by ADM), § 150:1.[10])

Likewise, ADM identifies no dominant and well-defined public policy against "discouraging" companies from reporting suspected illegalities.  Barclays Capital Inc. v. Shen, 20 Misc. 3d 319, 324-326, 857 N.Y.S.2d 873, 878-879 (N.Y. Sup. Ct. 2008), cited by ADM, does not address that at all.[11]  Moreover, nothing in the Award in any way "discourages" a

---

[10] Section 150:1 of the Oehmke treatise states:

To vacate an arbitration award on public policy grounds, … it must be shown that the policy is one that specifically militates against **the relief ordered by the arbitrator**. …

**The court must not revisit or question the fact-finding or the reasoning which produced the award,** but must take facts as found by the arbitrator (since the parties never bargained for the facts to be found by a court).

Courts do **not** possess broad power to set aside arbitration awards as against public policy.  However, an arbitration award can be vacated **if the relief granted in the award contravenes public policy….** The focus is the **arbitrator's remedy which must clash with an explicit, well-defined, and dominant public policy**…. (Emphasis added; footnotes omitted.)

[11] Barclays in fact involved a contention that the award was in manifest disregard of the law—which has not been made by ADM here.  In Barclays, the Court vacated a portion of the award that awarded punitive damages based on alleged defamatory statements made by a securities firm on a "U-5" filing that is required under the Federal securities laws.  The New York Court of Appeals had (in a case known as Rosenberg II) previously held that statements made on a U-5 are absolutely privileged under New York law and cannot give rise to a claim for damages.  857 N.Y.S.2d at 878-79.  The Court found that the arbitrator was aware of the Rosenberg II decision but chose to ignore it, thereby rendering his award in manifest disregard of the law.  857 N.Y.S.2d at 879.

1557234

company from reporting suspected illegalities to the relevant governmental authority.[12]  The only

thing the Award even arguably "discourages" a company from doing is violating its contractual

obligations—but that is in furtherance of the public policy of respecting contract rights, not

against it.

    In Affymax, 660 F.3d at 284, the losing party similarly argued that enforcing an award

(in that case, relating to the ownership of patents) would violate public policy.  The Seventh

Circuit summarily rejected that argument, writing that "Affymax does not contend that the

---

    The remaining cases cited by ADM similarly do not support its arguments here.  In In re
Fifth Third Bank, Nat. Ass'n, 716 S.E.2d 850, 857 (N.C. App. 2011), plaintiffs argued that the
arbitration award "rewarded" defendants for their own misconduct based on plaintiffs'
contentions that the arbitrator grounded the award on his personal perceptions and opinions.  Id.
at 857.  The Court expressly **declined** to decide whether that argument, if proved, would provide
a valid basis for vacating an award ("a subject about which we express no opinion"), and held
that no entitlement to relief on "public policy" had been demonstrated.  Id.  In Air Line Pilots
Ass'n, Int'l v. Trans States Airlines, LLC, 692 F. Supp. 2d 1105, 1114 (E.D. Mo. 2010), the
plaintiff argued that the payments there at issue were a loan, in violation of a federal statute.  The
arbitrator found that they were not a loan.  The Court refused to revisit the arbitrator's
determination.  In Kenneth M. Hughes, Inc. v. Aloha Tower Dev. Corp., 654 F. Supp. 2d 1142,
1153 (D. Ha. 2010), respondent argued that, since it was an agency of a state, the arbitration
award was infringing on its discretionary function, which had a potentially "chilling effect on
future development projects in the [s]tate."  The court held that no sufficient grounds for
vacating had been shown, and that the state had bargained for the arbitrator's interpretation of the
law "and is now bound by it."  In MCI Constructors, Inc. v. Hazen and Sawyer, P.C., Index Nos.
1:99CV2, 1:02CV396, 2009 WL 632930, at *10 (M.D.N.C. March 9, 2009), the defendants
argued that enforcement of the award violated public policy because the arbitrator
awarded both actual and liquidated damages for the same breach.  The Court rejected the
argument, writing that a reviewing court will not attempt to analyze an arbitrator's reasoning,
that nothing in the award indicated the arbitrator did such a thing and that, even if he did, that
would at most amount to an error of law which would not support overturning the award.  The
Court further noted that the alleged "public policy" pointed to by defendants was not "well
defined and dominant," as would be required for the public policy defense to enforcement to
apply.  And, in Sawtelle v. Waddell & Reed, 304 A.D.2d 103, 115, 754 N.Y.S.2d 264, 274 (1st
Dep't 2003), the Court upheld the award, finding no basis to the defendant's contention that it
had been procured through falsified evidence.

    [12] In this regard that, as the Arbitrator noted, to the extent ADM at any time believed any
transactions were in violation of the Venezuelan laws and regulations, it was free to report them
to the Venezuelan authorities.  ADM never did.  (Opp. MOL, 28.)

11

panel's award directs Ortho to violate any rule of positive law designed for the protection of third parties."  Here, the Award likewise does not require either ADM or Paillardon to take any actions that violate any rule of positive law, or even in any way assist in the commission of an illegality, and the same reasoning and conclusion apply.

(c)     ADM's arguments on why, in its view, the relevant public policy is Venezuelan law (Reply, 12) essentially repeat its prior arguments on this subject, which are addressed at pp. 26-29 & nn.38-39 of Paillardon's Opposition MOL.

ADM newly contends that enforcement of the award would violate Venezuelan public policy because it would result in "transferring money to a resident of Venezuela."  (Reply, 12.) That argument was not made in ADM's opening memorandum, and cannot be raised for the first time on reply—which ADM has acknowledged would be improper.[13]   In any event, ADM cites **no** authority to the effect that Venezuela public policy prohibits residents of that country from receiving funds, and the argument is, on its face, frivolous.

(d)     ADM argues that the alleged illegalities were in violation of a fundamental, well-defined and dominant Venezuelan public policy because, according to ADM's Venezuelan law expert in the Arbitration, they "plainly violated Venezuelan law."   (Reply, 12-13.)  In so arguing, ADM wholly **ignores** that (a) its expert conceded that he had **no** authority, other than his own say-so, to support his view, (b) Paillardon's Venezuelan law expert testified that ADM's expert opinion was incorrect and that the transactions in question were not in violation of any Venezuelan laws or regulations and (c) the Arbitrator found that **no** illegal conduct had occurred. (See Opp. MOL at 27-29.)  While, as previously stated, the underlying illegality is outside this

---

[13] See ADM Motion for Leave to File Oversized Reply Brief, at 2 (representing that proposed reply "does not seek to add any new arguments").

Court's scope of review and the relevant policy is U.S., not Venezuelan, law, in light of the foregoing ADM has in any event failed to identify a violation of any public policy that was "fundamental," "explicit," "well-defined" and "dominant," as would be required.

ADM also argues that the fact that the regulation on which its "illegality" argument was predicated has been repealed is immaterial. (Reply, 12.)  But even assuming, arguendo, that certain transactions had been in violation of the regulation, how could that represent a "fundamental" and "dominant" public policy of Venezuela if it was then repealed?  ADM has no answer to that, other than reference again to the testimony of its own arbitration expert (Reply, 12-13), which was not only contested by Paillardon's expert but rejected by the Arbitrator.

(e)      ADM here restates the truism that a court will not enforce an award where to do so would violate public policy. (Reply, 13.)  We do not disagree, but that adds nothing to the analysis, since enforcement of the award would not violate any relevant public policy here. (See Opp. MOL, 25-29; pp. 9-13 above.

The hypotheticals posited by ADM—an award ordering reinstatement of a drunken airline pilot or a teacher with a history of sexual abuse—are fully consistent: it is the **enforcement** of the award that violates public policy, not the underlying decision on liability. This is clear, for example, from Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, 886 F.2d 1200, 1214 (9th Cir. 1989), relied on by ADM, in which the award ordered the remedy of reinstatement.  The Court wrote:

> As we have explained, the critical inquiry is **not** whether the **underlying** act for which the employee was disciplined violates public policy, **but whether** there is a

public policy barring **reinstatement** of an individual who has committed a wrongful act.[14]

(See also cases cited in Opp. MOL, 23-24.)

ADM seeks to distinguish Baxter v. Abbott Labs., 315 F.3d 829 (7th Cir. 2003), on the ground that the public policy claim there was just another way of saying that antitrust matters are not arbitrable.  But that is precisely the point—if a court could revisit the Arbitrator's ruling on ADM's Venezuelan exchange law arguments, those effectively would not be arbitrable either.  Under Baxter, that result is not permissible.  (See also T. Oehmke, n.10 above.)

Finally, the Iron Workers case, cited by ADM, raises an additional point.  There, the Court wrote that, if the union believed that enforcement of the award would violate public policy, it should have developed that argument before the Arbitrator, 489 F.3d at 79.  Here, ADM not only failed to raise, in the Arbitration, any contention that a ruling on the Venezuelan exchange law issues in Paillardon's favor would somehow violate "public policy," but explicitly told the Arbitrator that he was empowered to decide those issues.  (See Opp. MOL, 28-29.)

## C.    ADM's Arguments that the Arbitrator "Ignored Defenses" Are Baseless

ADM asserts that Paillardon "does not dispute that the Arbitrator ignored" its "mercantile mandate" and "mitigation" defenses.  (Reply, 14.)  That is ridiculous.  As set out Paillardon's Response, the Arbitrator acknowledged ADM's "mercantile mandate" defense but rejected it, and also rejected ADM's argument that Delaware, rather than Venezuelan, law applied, thereby eliminating ADM's purported "mitigation" defense.  (Opp. MOL, 29-33.)  As further set out in

---

[14] Accord, Int'l Assn. of Bridge, Structural, Ornamental & Reinforcing Iron Workers Union Local # 7 v. Associated Gen. Contractors of Mass., Inc., 489 F.3d 75, 78-79 (1st Cir. Mass 2007) (finding that no merit to argument that **enforcement** of an arbitral award would impair competition in a relevant market).

Paillardon's Opposition MOL, the Arbitrator was not required to specifically address each of ADM's multitudinous arguments in his Award.  (<u>See</u> Opp. MOL, 12, 31.)

ADM continues, without elaboration, to cite <u>Wise v. Wachovia Secs., LLC</u>, 450 F.3d 265, 269 (7th Cir. 2006).  However, Paillardon's demonstration that the conditions for vacating an award under that <u>dictum</u> have not been even arguably met stands completely **unrebutted**. (<u>See</u> Opp. MOL, 29-30, 34 & n.50.)

## CONCLUSION

For the reasons stated above and in Paillardon's Memorandum of Law in Opposition to ADM's Petition to Vacate, ADM's Petition should be denied.

Dated:  November 6, 2012

Respectfully Submitted,

**REGIS PAILLARDON**

By: <u>/s/ Andrew W. B. Bequette</u>
      Andrew W. B. Bequette

BECKETT & WEBBER, P.C.
508 S. Broadway Avenue
P.O. Box 17160
Urbana, IL 61803-7160
Tel: 217-328-0263
Fax: 217-328-0290
E-mail: <u>andrew@beckettwebber.com</u>

- and -

Anthony B. Ullman (Bar No. 1981349)
SALANS LLP
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: 212-632-5500
Fax: 212-632-5555
E-mail: <u>aullman@salans.com</u>

15

1557234

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of November, 2012, I electronically filed the foregoing pleading with the Clerk of Court using the CM/EFC system, which will send notification of such filing to the following:

**Jon R Fetterolf**
WILLIAMS & CONNOLLY
725 12th St NW
Washington, DC 20005-5901
202-434-5351
Fax: 202-434-5029
Email: jfetterolf@wc.com

**Jerrold H Stocks**
FEATHERSTUN GAUMER POSTLEWAIT STOCKS FLYNN & HUBBARD
Suite 200
225 N Water St
PO Box 1760
Decatur, IL 62525-1760
217-429-4453
Fax: 217-425-8892
Email: jstocks@family-net.net

**Ryan Patrick McCarthy**
WILLIAMS & CONNOLLY
725 12th St NW
Washington, DC 20005-5901
202-434-5157
Fax: 202-434-5029
Email: rmccarthy@wc.com

Respectfully Submitted,

By: /s/ Anthony B. Ullman
     Anthony B. Ullman

(Bar No. 1981349)
SALANS LLP
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: 212-632-5500
Fax: 212-632-5555
E-mail: aullman@salans.com

16

1557234